STATE OF IOWA, Appellee, v. CHARLES T. KNAPP, Appellant.

INTOXICATING LIQUORS: Nuisance—Indictment—Alcoholic Nature of Liquors—Burden of Proof. Under an indictment for maintaining an intoxicating liquor nuisance, the burden of proof rests on the State to show, directly or by fair inference, the alcoholic nature of the liquor *at the time it was kept or sold by the defendant*. Evidence reviewed, and held to be insufficient to so show.

INTOXICATING LIQUORS: Nuisance—Indictment—Search Warrant Proceedings—Abatement. Undetermined search warrant proceedings against certain alleged intoxicating liquors may not be pleaded in abatement of criminal proceedings for maintaining a nuisance on the premises on which such liquors were seized.

*Appeal from Cherokee District Court.*—W. D. BOIES, Judge.

THURSDAY, JUNE 29, 1916.

CRIMINAL prosecution charging the defendant with the maintenance of a liquor nuisance.   There was a plea of not guilty and a plea in abatement.   There was a verdict of guilty and a judgment of conviction entered thereon.   Defendant appeals.—*Reversed.*

*Wm. Mulvaney,* for appellant.

*George Cosson,* Attorney General, and *John Fletcher,* Assistant Attorney General, for appellee.

EVANS, C. J.—1.   The defendant was duly indicted for nuisance.   The evidence against him on the trial was obtained in the main by means of a search warrant, in a certain proceeding had pursuant to Sections 2413, 2414, 2415 of the Code. The defendant conducted a bowling alley in the city of Cherokee.   Proceedings for search and seizure of intoxicating liquors were instituted against his place of business on December 2, 1913.   Certain liquids were seized as alleged intoxicating liquors.   These consisted of a certain quantity of cider, and another quantity of grape juice, and another of ''Security Brew.''   Sometime thereafter, an analysis of these liquids was had for the purpose of ascertaining whether they contained alcohol.   Some of them were later returned to the defendant, presumably as non-intoxicating.   The State introduced the testimony of many witnesses, but there is no evidence that has any tendency to show that the defendant ever kept intoxicating liquors in his place of business, unless some of the liquids thus seized were such.   It is not claimed for the State that all of the liquids thus seized were intoxicating.   The evidence for the State upon that question seems to have concentrated principally upon the cider.   The only evidence offered by the State to show the intoxicating character of any of the liquids was that of Dr. Cleaves, who made a chemical analysis of the same at the request of the State.   The serious question in the case is whether it is sufficient to support the judgment of conviction.   The liquor was seized on the morning of December 3d.

It was subjected to a chemical analysis by Dr. Cleaves some time in the afternoon or evening of December 4th. The following was his entire testimony on this question:

"I examined the contents of these bottles to determine whether or not the contents contained alcohol. My examination showed that the contents of the bottle marked Exhibit A did contain alcohol; the bottle marked Exhibit B contained alcohol. . . . I submitted the contents of each bottle to a chemical test, I did not make a quantitative analysis of the contents of the bottle marked Exhibit A and I am not able to state how much alcohol the contents of that bottle contained. The contents of the bottle marked Exhibit A was apparently cider. Sweet cider contains no alcohol. I could not say at what stage of fermentation this cider was when I submitted it to my test. If this cider was perfectly sweet on the morning of Dec. 3d, when the search was made at Knapp's place and the cider taken to the courthouse and put in a steam heated basement, and then taken to McNeal's office and samples taken and put in the bottle marked Exhibit A, and the bottle Exhibit A brought back to the courthouse, kept in a steam heated room until about 11 o'clock the next day, when it was brought to my office, the analysis made by me at that time would be no fair test as to whether or not the cider contained alcohol at the time it was taken from the Knapp building, and would not show whether or not the contents of that bottle contained alcohol when taken from the Knapp building. An analysis of the contents of the bottle marked Exhibit A, made 24 hours after the cider was taken from Knapp's building, would not show whether or not the cider contained alcohol when taken; it is possible that the day before I made the analysis the contents of Exhibit A contained no alcohol. It takes but a very short time for sweet cider to begin to ferment; from the analysis I made of the contents of the bottle Exhibit A, I cannot tell whether the contents of that bottle contained any alcohol, 24, 25 or 26 hours before. It would not be at all strange to find as much

alcohol as I did in the contents of the bottle marked Exhibit A, in cider that was absolutely sweet 24, 25 or 26 hours before. . . . It would not be strange to find that these bottles contained no alcohol the day before I made the analysis. From the condition of the bottles when I opened them, I would think that the contents was the same as when put in. There probably was no change. When alcohol is formed, there is also formed a carbonic acid gas. That gas is retained in the solution, under pressure, and when the pressure is removed, the liquid bubbles. If the fermentation has gone very far the corks would be lifted,—that is, blown. If the contents were put in these bottles, as described, and the bottles placed in a safe, as described by the witness Huber, and then delivered to me as described by the witness, it is very likely that a chemical change did take place between the time the contents were put in the bottles and the time they were delivered to me. Given the conditions as they were gone over here to me by Mr. Mulvaney, it is very likely a change might have taken place. I think that it is, however, unlikely that a change took place. I do not know how much alcohol the contents of the bottles contained. I just discovered that it contained alcohol.''

The evidence in the case is undisputed as to the conditions under which the bottles were kept and which formed the hypothesis upon which Dr. Cleaves testified. The contention for the defendant was that the cider was sweet cider which had just been received in its original receptacle, from which none had been sold. These receptacles were opened by the sheriff. A part of the contents was drawn into a vessel and then poured into bottles, for the purpose of preservation and analysis. It appears, also, that alleged intoxicating liquors were seized in other localities at the same time and by different officers, under the direction of the sheriff. The sheriff took a portion of the contents of each seizure, passing them all through the same vessel, without any attempt at cleansing, or keeping the one liquor from con-

1. INTOXICATING LIQUORS: nuisance: indictment: alcoholic nature of liquors: burden of proof.

taminating the other with its germs. ⸳It was clearly incumbent upon the State to show that the liquors were intoxicating liquors. We have held that the presence of alcohol, in whatever amount, is sufficient proof of that fact. But it must appear, either directly or by fair inference, that such was the state of the liquor at the time it was taken from the possession of the defendant. According to the concession of Dr. Cleaves, the evidence of alcohol at the time of his examination was so slight that it could have been produced by the fermentation of the preceding 24 hours. We think, therefore, the State failed to maintain its burden of proof at this point, and upon this testimony, it was not open to the State to claim an inference contrary to the doctor's testimony, there being no basis for such inference in any other testimony. We are required to hold, therefore, that the conviction is not sustained by the evidence at this point.

2. The defendant devotes a large part of his argument to his plea in abatement. The theory thereof is that the proceedings for search and seizure and condemnation of the liquor are still pending upon appeal, and, until such proceedings are disposed of by an adjudication, there can be no jurisdiction to try the present case; and that, when such proceedings are disposed of by adjudication, such adjudication will be a bar to the present prosecution.

2. INTOXICATING LIQUORS: nuisance: indictment: search warrant proceedings: abatement.

In view of our conclusion in the first division hereof, we have little occasion to deal with this question. It is sufficient to say that we think the defendant's theory of abatement is without merit. This prosecution is not dependent upon an adjudication in the search and seizure proceedings.

For the reason indicated in the first division hereof, the judgment below must be—*Reversed*.

DEEMER, WEAVER and PRESTON, JJ., concur.